Earnest Lee **DANIELS**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–76–60.

Court of Criminal Appeals of Oklahoma.

Aug. 13, 1976.

Richard A. Hoffman, Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Judge.

Appellant, Earnest Lee Daniels, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–74–1749, for the offense of Attempted Robbery With Firearms, After Former Conviction of a Felony, in violation of 21 O.S.1971, § 801. The jury fixed his punishment at Twenty-five (25) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

The State called as its first witness Lee Ann Hicks, a teller at the First National Drive-In Bank in downtown Tulsa, Oklahoma. The witness testified that on the morning of July 24, 1974, at 8:52 a. m.,

she was in her drive-in teller's booth when an older model white car pulled into her lane. The witness testified that she thought there were three black males in the automobile. However, due to her intense concentration on the driver of the automobile she testified that she could only be positive of the presence of two persons in the automobile, both of whom were in the front seat. The witness stated that she had $23,000 at her window and that the driver of the automobile pointed the gun at her and said "this is a robbery," and demanded that she give him all of her money. At this point the witness dropped to the floor and pulled her silent alarm at which time she heard a loud explosion and the shattering of glass. From her position on the floor she used the hotline phone to inform bank officials of the incident.

The State called as its next witness Ruth Ella Randles, a customer of the First National Bank. On the morning of July 24, 1974, the morning of the attempted armed robbery, the witness pulled in behind a white or off-white 1965 model Chevrolet which had a dent on the right back fender. The witness further testified that because of her habit of observing the prefixes on Oklahoma license plates she specifically recalled the prefix of CU on the automobile immediately in front of her. While the witness was waiting in line behind the 1965 Chevrolet, she heard a loud explosion, and immediately looked into the car in front of her. The witness testified that it was a very clear day and that she was practically bumper to bumper with the automobile in front of her, all of which tends to corroborate her final assertion that she had no difficulty seeing into the automobile ahead of her. When the witness looked into the vehicle, immediately after the explosion, she observed two black males. While she momentarily glanced into the car ahead of her the black male on the passenger side of the car turned around and directly faced her. At this point the witness laid herself down in the seat of her car to protect herself. In this testimony the wit-

ness positively identified the defendant, Earnest Lee Daniels, as the passenger in the automobile used in the attempted robbery of the First National Drive-In Bank.

On cross-examination the witness was asked if she had ever seen or known of the defendant prior to the attempted robbery. The witness testified that on various occasions, approximately ten years before, she had observed the defendant playing with other children on a playground in Tulsa. She also testified that he was known by the name of "Earnest." After further questioning into the matter the witness stated that even if she were mistaken as to the identity of the young man on the playground in Tulsa, she was nevertheless certain that this defendant was the man whom she had seen inside the car at the First National Drive-In Bank. Witness Randles also testified that she had seen the defendant earlier in the spring of 1974 coming out of a Git-N-Go store in Tulsa.

The State called as its next witness Detective Charles W. Sasser of the Tulsa Police Department who was assigned to investigate the attempted armed robbery of the First National Auto Drive-In Bank. Detective Sasser testified that on July 25, 1974, he and his partner, Bill McCracken, questioned Ruth Randles concerning the incident which had occurred the previous day. Detective Sasser testified that he knew of the defendant, who was also called "Speedy" Daniels. Approximately two weeks before the attempted robbery, Detective Sasser had observed the defendant in an automobile which fit the description of the automobile described by Ruth Randles. Upon checking his notes, he discovered that the tag number which he had inscribed in his notes was ZU–1918. Detective Sasser, knowing where the defendant resided, drove to the Morning Star Apartments looking for the defendant's automobile. In the parking lot at the apartments he found what he thought to be the defendant's car, only it bore the license number CU–1918. At this point Detective Sasser and his partner, Bill McCracken, picked up Ruth

Randles for the purpose of identifying the automobile. While en route to the Morning Star Apartments from Ruth Randles' place of employment, Detective Sasser showed Ruth Randles seven mug shots, from which she identified the defendant, Earnest Lee Daniels, as being the man who sat in the passenger seat of the automobile used in the attempted robbery. Then, upon arriving at the apartment parking lot, Ruth Randles pointed out the defendant's car as that car which had been used in the attempted robbery. After returning Ruth Randles to her place of employment, Detective Sasser and his partner returned to the Morning Star Apartments and arrested the defendant who, after being informed of his rights, admitted ownership of the car identified by Ruth Randles. Detective Sasser testified that at this point the defendant's car was hauled to the Al Storey Wrecker Shop and was there photographed. Later, on the evening of the 25th, Ruth Randles again picked the defendant out of a lineup at police headquarters.

Thereafter, the State rested its case.

The defendant called as his own witnesses Lee Ann Hicks and Detective Sasser. The testimony of Lee Ann Hicks established the fact that agents from the Federal Bureau of Investigation made an intensive inquiry into the attempted robbery of the bank. The testimony of Detective Sasser was in regard to the results of several tests which were executed by himself and his partner for the purpose of determining whether or not it was possible for the defendant to have participated in the attempted robbery at 8:52 a. m. and then to have arrived back at his place of employment, Chandler Material Company, by 9:00 a. m. Detective Sasser testified that these tests were run in an unmarked police vehicle and that on some runs all traffic signals were obeyed and on other runs they were not obeyed. The test results ranged from 6 minutes and 45 seconds to 8 minutes and 15 seconds.

The defendant also called Hill Diven, plant superintendent of Chandler Material Company, the defendant's place of employment. Diven testified that the defendant began work at Chandler Material Company on July 18, 1974. The witness testified that he was in charge of approximately 85 employees and that the method used for recording time was a time clock. Each employee was given a time card over a specified period and was required to punch in and out. Company rules prohibited employees from punching anyone's card except their own. However, Diven testified that he had observed from time to time employees clocking in for one another. From the defendant's time card, dated July 24, 1974, Diven testified that the defendant clocked in at 7:03 a. m. and clocked out at 4:58 p. m. However, Diven testified that he did not see the defendant punch the clock himself but Diven did testify that he specifically remembered seeing the defendant, accompanied by George Brice, at 7:30 on the morning of July 24, 1974. But, again the witness testified that he did not know the whereabouts of the defendant after 7:30 that morning. Diven also testified that there were no guards or check points which would effectively keep an employee from coming and going as he pleased.

The defendant also called two agents from the Federal Bureau of Investigation, Lawrence Fann and John Harrington. These agents testified that no federal charges had been filed against the defendant. Agent Harrington testified that he took samples of glass from the teller's booth for the purpose of comparing them with samples of glass which were found in the back seat of, and embedded in, the defendant's automobile. These glass particles were sent to Washington, D.C. to the F.B.I. laboratory where they were analyzed. Agent Harrington further testified that the results of the tests, which he received from the laboratory, determined that the particles of glass were not identical.

The defendant also called his mother, Velma Jennings, and his sister Shirley Palmer, as witnesses in his behalf. The testimony of these two persons was virtual-

ly identical. The obvious reason for the presentation of these two witnesses was to establish the residency of the defendant while he was purportedly observed by Ruth Randles playing on a school ground in Tulsa. The defendant, according to this testimony, grew up in Clinton, Oklahoma, and never resided in Tulsa until just prior to his arrest for the attempted armed robbery. His mother testified that he attended school in Clinton when he was 10, 11, 12, 13, and 14 years of age. However, on cross-examination the defendant's mother did testify that the defendant had, on various occasions, spent the night with relatives in Tulsa.

The defendant also called Shiela Williams, his girl friend, who also lived at the Morning Star Apartments. The witness testified that on the morning of July 24, 1974, the defendant, who was sleeping in her apartment, arose at approximately 6:00 a. m. She further testified that the defendant left her apartment at about 6:15 and went to the apartment of George Brice, who also lived at the Morning Star Apartments. A few minutes later the defendant returned to the witness' apartment with George Brice, at which time the defendant and Brice left for work in Brice's car. According to the testimony of the witness, the defendant rode with George Brice so that the witness could use defendant's car for transportation to and from her work. The witness then testified that she arrived at her place of employment, Manpower, Inc., at 7:50 or 7:55 a. m. on July 24, 1974. She testified that after leaving the automobile at that time she did not enter the automobile until later that afternoon. Further inquiry by the State revealed that the witness did not periodically check the car and, thus, she was unable to positively assert that the car had not been moved sometime during the day. Shiela Williams also testified that the defendant's car was not in good operating condition. She stated that the transmission was slipping and that the brakes were not in an operable condition.

The defendant called as his next witness George Brice, also an employee at Chan-

dler Material Company. The witness testified that he and the defendant were hired by Hill Diven, superintendent of Chandler Material Company, on July 18, 1974, to go to work immediately. Brice, testifying substantially the same as Shiela Williams, asserted that on the morning of July 24, 1974, he went to work, accompanied by the defendant, in his own automobile, a 1959 Ford. He stated that the defendant remained at work all day without leaving the premises. He further stated that the defendant did, indeed, punch his own time card and that during the few minutes between 8:52 and 9:00 a. m., the time of the attempted robbery, the defendant was present with him at work.

The defendant's next witnesses were Cornell Clemons and Curt Johnson, also employees at Chandler Material Company. Both of these witnesses testified that on the morning of July 24, 1974, they saw the defendant between 9:00 and 9:15 a. m. during their regular morning break. Both of these witnesses were very certain as to the date. Cornell Clemons did testify, however, that due to the physical characteristics of the brick plant it would be possible to leave and reenter without being detected.

The defendant took the stand in his own behalf and testified substantially the same as the previous defense witnesses. First of all, the defendant testified that he did not know Ruth Randles and further that he had never played in any kind of games in any school yard in the City of Tulsa. The defendant did admit to a prior felony conviction of grand larceny and a prior misdemeanor conviction of reckless handling of a firearm. The defendant further testified that he did not rob or attempt to rob the First National Drive-In Bank, insisting that he did not even have the car on the day in question. He also testified that if he had even had his car on July 24, said car was in no condition to be used in perpetration of an armed robbery.

Thereafter the defense rested.

■ The defendant in his first assignment of error contends that the trial court erred in its refusal to grant the defend-

ant's motion for a new trial on the grounds that the evidence against the defendant was so weak and uncertain that it was insufficient to sustain a conviction. In *Warner v. State,* Okl.Cr., 489 P.2d 526 (1971), this Court held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is sharp conflict in the evidence and different inferences may be drawn therefrom. This Court is of the opinion that the evidence adduced in the instant case was sufficient to sustain a verdict of guilty. The defendant in his brief asserts that the only evidence connecting Earnest Lee Daniels to the attempted robbery of the First National Drive-In Bank came from the witness, Ruth Ella Randles. He then asserts that this testimony "was so incredible and uncertain that it should not have been allowed." We cannot agree. In the opinion of this Court, this issue was sufficiently disposed of in the ruling by the trial court on the motion for new trial. In regard to the testimony of Ruth Randles the trial court stated as follows:

". . . Witness Ruth Randles described the vehicle which she saw immediately in front of her as a '65 Chevrolet off-white automobile. This witness also attested to the fact that she saw two black men in the car; that she was bumper-to-bumper with the car; that she saw a CU prefix on the license plate of the car; that the day was clear; she had no difficulty seeing the car or the occupants in it; that the passenger turned around and looked directly at her for a couple of seconds, that she had a full face view of the passenger and she identified the defendant, or as I believe she stated, this little man right here, as being one and the same that she observed as the passenger in the vehicle. Witness Randles further testified that she had played ball with the defendant when he was a boy, on school grounds with her children; that he was about 13 years of age at the time. The

Court has no competent reason to doubt that testimony in light of the testimony of the defendant and his mother that he did from time to time have occasion to visit Tulsa as a youth, although he did not routinely reside here but that he had spent the night in Tulsa from time to time. Witness Randles again testified that this was the man; she was sure. She attested to a dent on the right back fender of the car, which she observed in front of her. She later saw the car at the defendant's apartment, one and the same vehicle as the one which defendant acknowledged to Officer Sasser was his. She again saw and observed a CU prefix on the license plate and the dent in the car and identified the car clearly and unequivocally as one and the same used in the attempted armed robbery. She testified that when she looked at the car she told the officers, 'That's the car.' She likewise testified that she had seen the defendant coming out of a Git-N-Go or Quik-Trip Store on Main and Haskell in the spring of 1974; that she recognized him as one and the same person that she had played ball with on the ball lot. She likewise testified that at the time she played ball with him, he was known and called by his first name of Earnest. She testified that she viewed a line-up three or four days after the robbery, at which time she identified the defendant. This was the first line-up she viewed; that there was no doubt in her mind that she saw the defendant at the bank; that she got a good look at the defendant; that there was no doubt at all in her mind about her identification of the car in question.

* * *

"Insofar as the question of whether or not there was sufficient evidence to permit the jury to obtain a conviction, the Court concludes from the clear and unrefuted testimony of witness Ruth Randles and her unmistakable, unshakable position insofar as her identification of the defendant is concerned, that there was in

fact sufficient evidence for a conviction in this case. . . ." (Tr. 893–896)

In *Humphrey v. State,* Okl.Cr., 452 P.2d 590 (1969) and *Williams v. State,* Okl.Cr., 452 P.2d 595 (1969) this Court cited with approval *Queen v. State,* 35 Okl.Cr. 412, 250 P. 935 (1925), in holding:

". . . [T]he credibility of the witnesses and the weight and value to be given their testimony is peculiarly within the province of the jury, they may believe the evidence of one witness upon a state of facts as against the testimony of several testifying to a different state of facts."

The defendant's first assignment of error is without merit.

█ The defendant asserts in his second assignment of error that the trial court erred when it precluded any testimony by the F.B.I. agents as to whether or not they had ever arrested the defendant. This Court deems it unnecessary to discuss the merits of this argument. This particular testimony which the defendant sought to introduce was prohibited when the State's objection thereto was sustained. However, Agent Fann was subsequently permitted to testify that to his knowledge the defendant had never been subject to his custody or control. [Tr. 496] And subsequently, during the testimony of John Harrington, [Tr. 522] also an agent for the Federal Bureau of Investigation, the State withdrew its objection to the defendant's question as to whether or not the F.B.I. had ever arrested the defendant for the attempted bank robbery. And, Agent Harrington testified that he had neither arrested, nor received a warrant for the arrest of the defendant. Therefore, the evidence which the defendant contends should have been admitted was, in fact, admitted. Any further argument would be pointless.

█ The defendant also contends, within his second assignment of error, that the trial court committed reversible error by sustaining the State's objection to testimony of the F.B.I. agents as to their opinion of the guilt or innocence of the defendant. The defendant in this contention proffers the argument that the F.B.I. agents, being experts in the field of criminal investigation, should be allowed to give their opinion as to guilt or innocence based on their expert capacity. Relative to the matter of expert testimony the following language from III Wharton's Criminal Evidence, § 586 (13th ed. 1973), is particularly relevant:

"If, in order to understand the relevant facts and to resolve an issue, the jury needs scientific, technical, or specialized knowledge the testimony of an expert witness may be necessary. Putting it another way, if the jury cannot intelligently resolve an issue on the basis of common or ordinary knowledge and experience, the guidance of an expert witness is necessary. . . ." (Footnote omitted)

Also, from III Wharton's Criminal Evidence, § 588, (13th ed. 1973) it is said:

"To qualify as an expert, a witness must have acquired such knowledge of the subject matter about which he is to testify, by education, training, or experience, that he can provide the jury with guidance in resolving an issue for which the jury's ordinary knowledge is inadequate. . . ." (Footnote omitted)

With the foregoing authority in mind, this Court would note that the expertise of the F.B.I. lies in the field of Criminal investigation. In the instant case agents Fann and Harrington were permitted to relate in detail the discovery and analysis of all physical evidence they had encountered in the course of their investigation. They were also allowed to relate the content of statements obtained from Lee Ann Hicks and Ruth Ella Randles. The defendant now contends that this investigative expertise extends beyond the gathering of physical facts and data, permitting the valid rendition of opinions as to guilt or innocence. Such a contention cannot be sustained. The determination of guilt or innocence is a function which lies within the province of

the jury. And, expert testimony which invades that province should not be admitted. See, *Pollock v. State,* 26 Okl.Cr. 196, 223 P. 210 (1924); *McKee v. State,* Okl.Cr., 372 P.2d 243 (1962); *Ray v. State,* Okl.Cr., 510 P.2d 1395 (1973).

Also, in III Wharton's Criminal Evidence, § 605 (13th ed. 1973), it is stated:

"Ordinarily, the opinion of a lay or expert witness is not admissible if it amounts to a conclusion of law or a mixed conclusion of law and fact. *Thus, a witness may not state his opinion as to whether . . . the defendant was guilty or innocent of the crime charged; . . .*" (Footnotes omitted). [Emphasis original]

See also, *Blackwell v. State,* 76 Fla. 124, 79 So. 731 (1918); *State v. Sikes,* 149 La. 75, 88 So. 693 (1921); *Foreman v. State,* 198 Ark. 888, 132 S.W.2d 13 (1939).

Based on the foregoing reasons this Court is of the opinion that the defendant's second assignment of error is without merit.

■ In his third assignment of error the defendant contends that he was unable to prepare an adequate defense due to the ruling of a magistrate denying him access to his automobile. The defendant maintains that his car was in such poor condition that it was impossible for the automobile to have been used in the robbery. In the statement of this assignment the defendant asserts that both the magistrate and the trial court erred "by not allowing the defendant's attorney to conduct tests that might be exculpatory to the defendant. . . ." The defendant was, in effect, attempting to present an alternative defense. In his testimony, and in the testimony of George L. Brice and Shiela Williams, it is asserted that the defendant's automobile was at Shiela Williams' place of employment. But, if the jury chose to disbelieve that testimony, the defendant would contend, in the alternative, that his car was mechanically incapable of reaching his place of employment from the bank in the same amount of time as did the police vehicles used in the tests performed by the officers.

First of all, it is the defendant's contention that he was deprived of this defense. However, he was in fact not so deprived. In his testimony he stated that the car could not, due to its condition, be used in a robbery. The defendant's girlfriend, Shiela Williams, also testified that the car was in very bad shape and that she had never operated it in access of 35 miles per hour. So, in truth, the defendant was not, as he now contends; denied his defense of impossibility. The evidence which the defendant sought to obtain was merely cumulative in nature to the above testimony.

Secondly, upon review of the defendant's "application for mechanical examination of motor vehicle" we observe that the defendant's request therein is significantly different than the request he now asserts was error to deny. The application made to the magistrate solicits an order from the Court compelling officers of the Tulsa Police Department to conduct a mechanical examination of the automobile. But, in this appeal, the defendant urges that it was error to deny his request allowing his attorney to conduct tests. In fact, the defendant never received a ruling on the error asserted herein. To request an order directing officers to conduct an examination is quite different from requesting that the automobile be delivered to the defendant for purposes of conducting an examination. The defendant throughout his brief on this assignment addressed his argument to the impropriety of a ruling which was, in fact, never made.

Also, of substantial import is the fact the record is insufficient to support the defendant's assignment of error. First of all, he asserts that both the magistrate and the trial court erred. However, the defendant failed to renew his application either during the preliminary hearing or during the trial. Therefore, the only ruling made on this application, which was filed July 31, 1974, by the defendant, was made

sometime prior to the preliminary hearing, which was held on September 11, 1974. And, this Court, has, in vain, searched for a record or transcript in which the magistrate ruled on the defendant's application. As it now stands the defendant's assertion that his application was denied is the only proof of such a denial. The record does not support it.

It appearing to the Court that the defendant's allegation that he applied for an Order of the Magistrate and the trial court permitting his attorney to test the defendant's vehicle and that both the Magistrate and the trial court denied such application; and it further appearing to the Court that the record does not support such allegation, we are of the opinion that this assignment of error is without merit.

█ The defendant's fourth assignment of error is predicated upon statements and conduct by the prosecutor which allegedly prejudiced the defendant. This Court deems it unnecessary to relate these specific instances of alleged impropriety for the reason that no objections, prior to this appeal, were ever made in relation thereto. It is well established by a long line of authority that objections, not reaching issues fundamental in nature, will not be heard for the first time on appeal. *Hill v. State*, Okl.Cr., 500 P.2d 1080 (1972); *Sargent v. State*, Okl.Cr., 509 P.2d 143 (1973); *Hawkins v. State*, Okl.Cr., 510 P.2d 693 (1973); *Thompson v. State*, Okl.Cr., 541 P.2d 1328 (1975). Since none of the alleged errors argued under the defendant's fourth assignment of error were properly preserved for review by this Court, we cannot consider them.

█ This leads us to a consideration of the defendant's fifth assignment of error under which it is argued that the trial court committed fundamental error by refusing the defendant's request that the second stage of the bifurcated proceeding be waived. It is interesting to note that the defendant's objection to the second stage of the proceeding was not offered until after

a verdict of guilty had been reached in the first stage of the proceeding. If the defendant's motion had been granted at this time the jury would have been unable to set punishment. Such a contention goes to the very heart of the Habitual Criminal Act, 22 O.S.1971, § 860. It is the purpose of this act that a jury be given the opportunity to set a more severe punishment for second or multiple offenders. The defendant contends that since the evidence of the prior convictions was admitted during the first stage of the trial that there was no need to conduct a second stage. However, the Court instructed the jury in the first stage that evidence of prior convictions could be considered only for the purpose of reflecting on the credibility of the witness. It was therefore necessary that a second stage be conducted for the purpose of assessing penalty within the contemplation of the habitual offender act. This Court has previously considered this same argument and has ruled that it was not error to conduct the second stage of the bifurcated proceedings over objections by the defendant. See, *Carney v. State*, Okl.Cr., 406 P.2d 1003 (1965); *Wilmeth v. State*, Okl.Cr., 520 P.2d 699 (1974). Therefore, we conclude that the trial court did not commit error by overruling the defendant's motion to eliminate the second stage of trial.

█ The defendant contends in his sixth assignment of error that the deliberations conducted by the jury were highly prejudicial and denied the defendant a fair trial. Some weeks subsequent to the jury's verdict a particular juror approached the defense counsel contending that the other jurors had misled him as to certain testimony. At the hearing on motion for new trial, the trial court sustained the State's objection to the testimony of this particular juror on the grounds that a juror may not, by way of testimony or affidavit, impeach his own verdict. After sustaining the State's objection the trial court allowed the defendant to make an offer of proof. However, we are of the opinion that the trial court's ruling was supported by an

unbroken line of authority. In *Munn v. State,* Okl.Cr., 459 P.2d 628 (1969), we quoted with approval from *Cortez v. State,* Okl.Cr., 415 P.2d 196 (1966), stating:

"Jurors will not be permitted to impeach or contradict their verdict by affidavits, or otherwise, after they have been discharged from the jury and mingled with the public."

See also, *Overton v. State,* 7 Okl.Cr. 203, 123 P. 175 (1912); *Leasure v. State,* 48 Okl.Cr. 307, 290 P. 931 (1930); *Martin v. State,* 92 Okl.Cr. 182, 222 P.2d 534 (1950); *Taylor v. State,* Okl.Cr., 265 P.2d 733 (1954). In light of the foregoing authority the trial court's ruling was not erroneous.

■ The defendant's seventh assignment of error is predicated upon the reading of the information by the prosecutor. Originally, the defendant was jointly charged with one Samuel Folks, however, a severance was subsequently granted. When the information was read to the jury, the name of Samuel Folks had not been deleted. Also, the State's first witness, Lee Ann Hicks, was allowed to testify that she had identified Samuel Folks as the driver of the vehicle used in the attempted robbery. The defendant contends that this reading, coupled with the identification of Folks, forced him to take the stand, in contravention of his Fifth Amendment rights, to deny any acquaintance with Samuel Folks.

First of all, this Court notes that in 22 O.S.1971, § 831, it is required by law that the indictment or information in a felony case be read to the jury by the clerk or prosecutor. In *Tice v. State,* Okl.Cr., 283 P.2d 872 (1955), this Court held that the failure to delete from the reading of the information the name of the co-defendant who had been granted a severance was not error. We stated in *Tice,* supra, that "the deletion of such matter is within the sound judicial discretion of the trial judge, which in the absence of abuse will not be interfered with."

■

In the instant case, as stated above, the defendant contends that he was forced to take the stand to deny any acquaintance with Samuel Folks. Such is not the case. The State's witness, Lee Ann Hicks placed Samuel Folks in the driver's seat of the get-away vehicle; the testimony of Ruth Randles placed the defendant, Daniels, in the passenger's side of the same vehicle. What the defendant needed to refute was the evidence that placed him in that car. And, the alibi defense which the defendant offered contained the testimony of several witnesses who testified that the defendant was at work during the time of the robbery. The defendant's testimony was merely cumulative of the testimony of his witnesses. The defendant was in no way forced to take the stand in violation of his Fifth Amendment right. The decision to testify was entirely his own. Based on this discussion and based on our holding in *Tice v. State,* supra, we find the defendant's seventh assignment of error to be without merit.

The defendant contends in his eighth assignment of error that the trial court committed prejudicial error by excluding the testimony of Tulsa Chief of Police, Jack Purdie, at the hearing on the motion for new trial. However, an offer of proof was allowed by the trial court as to the testimony of Jack Purdie. The defendant then in his brief completely ignores the fact that the testimony was excluded and never cites any authority in support of the proposition that the testimony should have been allowed. The remainder of the defendant's argument, under this assignment, urges that the testimony of Jack Purdie was sufficient grounds to order a new trial. In effect, the defendant has raised two separate propositions within this assignment of error.

■ First, since the assertion that the trial court committed error in excluding the testimony of Jack Purdie was not supported by authority and since the question does not involve fundamental rights this Court

will not search the books for authorities to support the mere assertion that the trial court has erred. See, *Sandefur v. State*, Okl.Cr., 461 P.2d 954 (1969); *Battle v. State*, Okl.Cr., 478 P.2d 1005 (1970).

█ Secondly, even if the proffered testimony of Jack Purdie had been allowed, the same would not have served as grounds for a new trial. The defendant states in his brief that the testimony of Jack Purdie, if he had been allowed to testify, would have been as follows: That he was aware of defendant's situation at the time of trial; that he had great concern over the results of the trial; that the Tulsa Police Department cooperates with the Federal Bureau of Investigation; that the Federal Bureau of Investigation had not filed criminal charges against the defendant; and, that they, the Tulsa Police Department, were still investigating the defendant's case. The defendant then asserts that such testimony would have weighed heavily on the jury's minds and should have been allowed in the interest of justice. In *Walters v. State,* Okl.Cr., 403 P.2d 267 (1965), this Court held:

"The granting of a new trial on the ground of newly discovered testimony is a matter largely within the trial court's discretion and is not to be exercised except where there is reasonable probability that, if such evidence had been introduced, different results would have been reached. . . ."

Also, in *Carson v. State,* Okl.Cr., 529 P.2d 499 (1974), this Court citing *Walters v. State,* supra, stated:

". . . Whether or not a Motion for New Trial on the basis of newly discovered evidence shall be granted is clearly within the discretion of the trial judge and this Court will not overturn the trial

judge's decision unless that discretion is abused. . . ."

The testimony of Chief of Police Jack Purdie largely consisted of his own opinion which he in turn gathered from: newspaper accounts; the opinions of F.B.I. agents; and, the opinions of Tulsa Police Officers. In effect, the defendant offered the testimony of Jack Purdie for the purpose of allowing him to testify as to his own opinion of the defendant's guilt. Most likely this testimony would not have been admissible for reasons previously given in response to the defendant's second assignment of error. However, even if admissible, it does not meet criteria that newly discovered evidence must meet, in order to warrant the granting of a new trial. The defendant's eighth assignment of error is without merit.

█ The defendant, in his final assignment of error, contends that twenty-five (25) years was excessive punishment. In *Clouse v. State,* Okl.Cr., 389 P.2d 1002 (1964), we held:

". . . this Court does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances the sentence is so excessive as to shock the conscience of the Court. . . ." (Citations omitted)

The violent nature of the offense in the instant case, coupled with the fact that the defendant had been convicted of a prior felony is an adequate basis upon which the jury could return a sentence of twenty-five (25) years. This assignment of error is without merit.

For all of the above and foregoing reasons, the judgment and sentence appealed from is accordingly, *AFFIRMED.*

BRETT, P. J., and BLISS, J., concur.